UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  03/24/2022

UNITED PROBATION OFFICERS
ASSOCIATION, individually and on behalf
of its members, JEAN BROWN, TANGA
JOHNSON, TARA SMITH, EMMA
STOVALL, and CATHY WASHINGTON,
on behalf of themselves and all other similarly
situated individuals,

                              Plaintiffs,

                v.

CITY OF NEW YORK,

                              Defendant.

No. 21-cv-0218 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs in this putative class action are the United Probation Officers Association and

five current or former employees of the New York City Department of Probation (collectively,

"Plaintiffs").  They allege that Defendant City of New York ("the City") discriminates against

female probation officers of color through its compensation and promotional practices.  Before the

Court is the City's motion to dismiss Plaintiffs' First Amended Complaint.  For the reasons that

follow, the City's motion is granted, albeit without prejudice to amendment.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Plaintiffs' First Amended Complaint ("Compl.") and

exhibits attached thereto and are assumed to be true for the purposes of this motion.  *See Stadnick*

*v. Vivint Solar, Inc.*, 861 F.3d 31, 33 (2d Cir. 2017); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142,

150 (2d Cir. 1993).

Plaintiffs are the United Probation Officers Association ("the UPOA")—a union that represents hundreds of current and former employees of the New York City Department of Probation ("DOP")—and five Black or Hispanic women who are current or former DOP employees. Compl. ¶¶ 7-12. Jean Brown, Tara Smith, and Cathy Washington are Probation Officers; Emma Stovall is a Supervising Probation Officer; and Tanga Johnson is a retired Supervising Probation Officer. *Id.* ¶¶ 72-76. Generally, a Probation Officer must take and pass a civil service exam to be eligible for promotion to Supervising Probation Officer. *See* N.Y. Civ. Serv. L. § 52. Of those eligible, the City must promote one of the three persons "standing highest on such eligible list"—that is, one of the three highest scorers on the exam. *See id.* § 61. There appear to be no requirements regarding which of those three individuals the City may promote.

On July 26, 2017, the UPOA and the City entered into a collective bargaining agreement that set minimum and maximum salaries for Probation Officer Trainees, Probation Officers, and Supervising Probation Officers for the period December 28, 2009 to April 27, 2017. Compl. Ex. B at 4-6. The agreement also established a schedule governing pay increases during that time period and committed to giving employees certain salary increases on the condition that an employee received satisfactory evaluation ratings. *Id.* at 7, 10-12. It further set the pay rate for new hires as a certain percentage of the minimum pay rate for corresponding incumbent employees. *Id.* at 8.

Plaintiffs seek to represent a class defined as "Probation Officer Trainees, Probation Officers, and Supervising Probation Officers," which they refer to collectively as "Probation Officers"—a choice of terminology that results in some confusion. Compl. ¶¶ 7, 78. Today, "Probation Officers are overwhelming and almost exclusively non-white and female." *Id.* ¶ 24. This composition is the result of a decades-long demographic shift starting in "the early 1990's."

*Id.* (describing a shift from 1985 to 2010 where Probation Officers went from 15% non-white and 25% female to 80% non-white and over 70% female).

According to Plaintiffs, as Probation Officers have become more female and of color, the City has "engag[ed] in policies and practices which led to the reduction of the compensation . . . of Probation Officers" and which required Probation Officers "to take on overwhelmingly more work, with less support and less pay." *Id.* ¶ 25. Specifically, Plaintiffs contend that the City has kept Probation Officers' pay "at the lowest end of the salary range [allowed by the collective bargaining agreement] throughout their employment" and that no Probation Officers "are paid the maximum salary" allowed by that agreement. *Id.* ¶¶ 59-60; *see id.* ¶ 28. They also allege that the City has both reduced opportunities for paid overtime and has "den[ied] overtime or ma[de] it impossible to get permission for overtime" in connection with increased workloads. *Id.* ¶ 42-44. Plaintiffs assert that "[w]hen Probation Officers were more white and male," "they were compensated additionally for increases in their caseload work, and given meritorious salary increases." *Id.* ¶ 50.[1]

As the City purportedly suppresses compensation for Probation Officers, it "pay[s] at higher rates upper-level employees and employees who are in titles in the DOP that are more white and male." *Id.* ¶ 29; *see id.* ¶ 51 (describing "the discretion in pay within the DOP which results in other more white and male titles and other employees being paid more than Probation Officers"). Plaintiffs cite as an example "Administrative Staff Analysts," who occupy a role in the DOP that

---

[1] Some aspects of Plaintiffs' Complaint suggest a discrimination claim based on a comparison between current Probation Officers and former Probation Officers. *See, e.g.*, Compl. ¶ 34 ("When current and past pay rates for Probation Officers are analyzed comparing the difference before and after the demographic changes, it shows that Defendant has engaged in a pattern and/or practice of wage suppression of Probation Officers, along with disparate promotional and other employment practices that have adversely impacted women and people of color employed in the DOP. (See Precision Analytics Report, attached hereto as Exhibit C).") But Plaintiffs clarified at oral argument that their historical allegations are not intended to form the basis of a distinct discrimination claim, Oral Arg. Tr. at 29:9-22; moreover, the cited report does not discuss past salaries.

apparently requires less "skill[,] knowledge and ability" but who are paid significantly more than Probation Officers; these Analysts are "predominantly white and male." *Id.* ¶ 56. Plaintiffs do not describe the job responsibilities of Administrative Staff Analysts as compared to Probation Officers.

In addition to alleged pay discrimination against all Probation Officers as a group, Plaintiffs assert that "Probation Officers who are female and non-white are paid less than their white and male counterparts in the same titles, despite the fact that they are performing the same or substantially the same work," and are "given less employment opportunities such as promotions, pay increases and career opportunities." *Id.* ¶ 61. At argument, Plaintiffs explained that this statement alleges that white male Probation Officer Trainees are paid more than female Probation Officer Trainees of color; that white male Probation Officers are paid more than female Probation Officers of color; and that white male Supervising Probation Officers are paid more than female Supervising Probation Officers of color. They assert that "among recent hires, male Probation Officers earned, on average, over $2,500 more than female Probation Officers, and the average salary increase from 2014-2017 was nearly $1,000 higher for men than for women in the DOP." *Id.* ¶ 62. These numbers are drawn from a March 2018 report by the New York City Office of the Public Advocate. *See* Compl. Ex. D at 32, 34 (documenting that new DOP male hires are paid an average of $2,583 more than new DOP female hires and that men in the DOP receive an average pay increase of $971 more than women in the DOP). The report does not, however, break down this data by title such that it can be determined whether these pay disparities are present within specific DOP titles, as opposed to merely present within the DOP as a whole.

Finally, Plaintiffs allege discriminatory promotional practices. *See id.* ¶ 30 ("The DOP also disproportionately promotes white and male Probation Officers and other DOP employees.");

*id.* ¶ 34 (describing "disparate promotional and other employment practices"); *id.* ¶ 41 ("[T]he few who are able to climb the career ladder to Supervising Probation Officer now are, at a higher rate, white and male."); *id.* ¶ 67 ("[F]or those discretionary promotions that do occur, white men are promoted at statistically significant higher rates than women and/or non-white employees, and these promotions are not commensurate with time in title, education, experience, or other merit-based qualifications."). Plaintiffs also assert that "the DOP does not offer promotional opportunities for Probation Officers or advertise when there are openings for positions that pay higher rates within the DOP to let Probation Officers know of these opportunities." *Id.* ¶ 32. They do not, however, describe any discrete denials of promotions or promotional opportunities, or any specific failures to notify Probation Officers about promotional opportunities. Nor do they describe the role of the City's exam governing promotions in this allegedly discriminatory promotional scheme.

An economist that Plaintiffs retained analyzed demographic, salary, and title data for 439 UPOA members who were DOP employees. He observed that "white males earn substantially higher salaries than their counterparts" in the DOP—but noted that "these average salaries do not account for other factors" such as "title." Compl. Ex. C at 2. Indeed, he "concluded that [the] salary disparities . . . are largely attributable to race and gender disparities in job title." *Id.* at 1. Specifically, he found that "white males with the exact same tenure at DOP and exact same education level as their counterparts of other races and/or gender are almost twice as likely to become supervising probation officers." *Id.* at 4; *see id.* at 2 (finding that 73% of white men in the sample were Supervising Probation Officers, as compared to just 17% of women of color in the sample). He also observed that no Probation Officer in the sample was paid the maximum salary

allowed by the collective bargaining agreement, although it is unclear whether he is referring here to the singular title or to all three titles. *Id.* at 4.

## II.    Procedural Background

On June 7, 2019, UPOA filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on behalf of itself and its members, referred to as John and Jane Does. Compl. ¶ 14. On October 15, 2020, the U.S. Department of Justice issued a Notice of Right to Sue. *Id.* ¶ 15. Plaintiffs filed their original complaint on January 12, 2021, naming both the DOP and the City as defendants. In response to Defendants' first motion to dismiss, Plaintiffs filed the First Amended Complaint, which drops the DOP as a defendant. Defendants then moved to dismiss the First Amended Complaint, and the Court heard oral argument on March 1, 2022.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*; claims that are merely "conceivable" or "consistent with" liability are insufficient, *Twombly*, 550 U.S. at 545, 570. In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). The Court need not, however, credit factual statements that are conclusory, *see Pyskaty v.*

*Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017), or "threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678.[2]

## DISCUSSION

Plaintiffs raise claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Fourteenth Amendment's Equal Protection Clause (via 42 U.S.C. § 1983), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). As to their claims under Title VII and the human rights laws, they assert both disparate impact and disparate treatment theories of liability. *See Maresco v. Evans Chemetics Division of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992) ("The same conduct can form the basis of a disparate treatment claim and a disparate impact claim, as the two theories are simply alternative doctrinal premises for a statutory violation."). In addition to challenging Plaintiffs' claims on the merits, the City argues that Plaintiffs have failed to exhaust their administrative remedies and that Plaintiffs' claims are time-barred at least in part. The Court concludes that Plaintiffs have failed to state a claim on each of their theories of liability but grants them leave to file an amended complaint so they can have one more opportunity to attempt to do so.[3]

## I.      Title VII Claims

The Court construes Plaintiffs' Complaint as raising two distinct Title VII claims: one alleging discriminatory compensation practices and one alleging discriminatory promotional

---

[2] Unless otherwise noted, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

[3] Because the Court dismisses Plaintiffs' claims on other grounds, it need not reach the issue whether they have exhausted their administrative remedies. *See Francis v. City of New York*, 235 F.3d 763, 767 (2d Cir. 2000) (holding that failure to exhaust administrative remedies is a waivable prerequisite to bringing a Title VII claim in federal court, rather than a jurisdictional requirement).

practices.  As currently pleaded, the first claim is timely but fails to plausibly state a claim, and the second claim fails to plead either timeliness or a plausible claim.[4]

A.      **Legal Framework**

1.      **Statute of Limitations**

The City argues that Plaintiffs' Title VII claims are time-barred to the extent that any conduct in support of those claims occurred prior to August 11, 2018—300 days before the EEOC charge was filed.  In response, Plaintiffs rely on the continuing violation doctrine, asserting that the City's discrimination is an ongoing practice that has extended into the present day.  Thus, they assert, not only are their Title VII claims timely, but the Court may also consider the City's pre-limitations-period conduct in its merits assessment.

In New York, a Title VII "claimant must make [an] EEOC filing within 300 days of the alleged discriminatory conduct"; failure to do so renders any such claim time-barred.  *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e–5).  Claims under § 1983, the NYSHRL, and the NYCHRL are governed by a three-year statute of limitations.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  "Because the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run."  *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014).

---

[4] Although the "assignment of an excessive workload" is recognized as "an adverse employment action," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015), Plaintiffs clarified at argument that their allegations regarding higher workloads are part of their discriminatory compensation claim and not a freestanding claim.  Oral Arg. Tr. at 28:8-13.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court rejected the continuing violation doctrine's applicability to Title VII claims that rest on discrete discriminatory acts.  Instead, the Court held, a plaintiff "must file a [EEOC] charge within either 180 or 300 days of the date of the [discrete discriminatory] act or lose the ability to recover for it." *Id.* at 110; *accord Velez v. Reynolds*, 325 F. Supp. 2d 293, 312 (S.D.N.Y. 2004) ("*Morgan* eliminated the continuing violation doctrine for Title VII claims involving discrete discriminatory acts.").  By contrast, a plaintiff claiming a hostile work environment may rely on the continuing violation doctrine, under which a claim is timely so long as one act contributing to the hostile work environment occurred within the limitations period.  *See Morgan*, 536 U.S. at 119-20.

*Morgan* did not consider the continuing violation doctrine's applicability to Title VII "pattern-or-practice" claims.  *Id.* at 2073 n.9.  However, in *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), the Second Circuit explained that Title VII disparate treatment and disparate impact claims that are based on "[d]iscrete acts" which "fall outside the limitations period[] cannot be brought . . . even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."  *Id.* at 157.  In other words, an "allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claims are merely discrete acts."  *Id.*  The Court recognizes that the claims in *Chin* were individual claims rather than the class-wide pattern-or-practice claims brought here, and that while some of the cases on which *Chin* relied did extend their holdings to pattern-or-practice claims, others explicitly declined to do so.  *See id.*; *compare Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004), *with Lyons v. England*, 307 F.3d 1092, 1107 & n.8 (9th Cir. 2002).  This Court has, however, previously interpreted *Chin* as

applying to class-wide pattern-or-practice claims that are based on discrete acts, *see Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 459 (S.D.N.Y. 2014), and it continues to do so here.

Pay discrimination is a discrete act that occurs each time an individual is paid wages that have been lowered as a result of a discriminatory practice or decision. *See Davis v. Bombardier Transp. Holdings (USA) Inc.*, 794 F.3d 266, 269 (2d Cir. 2015); 42 U.S.C. § 2000e-5(e)(3)(A) (explaining that pay discrimination occurs "when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice"); *Barrett*, 39 F. Supp. 3d at 459 (applying *Chin* to conclude that class-wide claims of a pattern or practice of discriminatory compensation alleged discrete acts that were not subject to the continuing violation doctrine). Failure to promote is similarly treated as a discrete act, even when it occurs as part of a class-wide pattern or practice. *See id.*; *Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 412 (E.D.N.Y. 2010) ("Discrete acts that are easy to identify, such as termination, failure to promote, [and] denial of transfer, will not be saved even where a plaintiff alleges a continuing policy of discrimination or retaliation." (citing *Morgan*)).

Thus, even though Plaintiffs allege that the DOP's compensation and promotional practices are part of a "pattern and/or practice" of discrimination, Compl. ¶ 34, the Court treats them as a series of discrete acts, meaning that the continuing violation doctrine is not available for either of their Title VII claims.[5]

---

[5] To the extent Plaintiffs intend to argue that *Chin* does not control because this is a class action raising pattern-or-practice allegations, such an argument would not change the outcome. Even if Plaintiffs' claims were properly assessed under the continuing violation doctrine, their discriminatory promotion claim would still be untimely because, as explained below, they have failed to allege that any act contributing to or furthering a practice of discriminatory promotion occurred within the limitations period.

### 2.     Merits

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  The law protects employees from "both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."  *Id.*

To state a disparate treatment claim, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega*, 801 F.3d at 86.  She "need not plead a prima facie case of discrimination" at the motion to dismiss stage.  *Id.* at 83 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)).  Rather, she "need only plausibly allege facts that provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* at 86-87.  An inference of discrimination can arise from circumstances including, but not limited to, "the more favorable treatment of employees not in the protected group." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Plaintiffs' disparate treatment claims rely on a pattern-or-practice theory.  A "pattern or practice case is not a separate and free-standing cause of action, but is really merely another method by which disparate treatment can be shown." *United States v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013).  Rather than showing discrimination against a particular employee, "a plaintiff's burden under the pattern-or-practice method requires the plaintiff to prove only the existence of a discriminatory policy." *Chin*, 685 F.3d at 149.  To ultimately "prevail on a pattern or practice disparate treatment claim . . . plaintiffs must demonstrate that intentional discrimination was the employer's 'standard operating procedure.'" *Wright v. Stern*, 450 F. Supp. 2d 335, 363

(S.D.N.Y. 2006) (quoting *Teamsters*, 431 U.S. at 336).  This Court has rejected "the proposition that statistics must be pled in the complaint in order to survive a motion to dismiss" a pattern-or-practice claim—but "allegations of statistical disparities will go a long way toward making such a claim plausible."  *Barrett*, 39 F. Supp. 3d at 429-30; *accord City of New York*, 717 F.3d at 84 (explaining that "a statistical showing of disparate impact might suffice" to plausibly allege "a policy of intentional discrimination").  Alternatively, "allegations of a sufficient number of instances of discrimination" suffice to allege a pattern or practice.  *Barrett*, 39 F. Supp. 3d at 430.

Title VII also prohibits "employers' facially neutral practices that, in fact, are discriminatory in operation."  *Ricci*, 557 U.S. at 577-78.  Under this disparate impact theory of liability, "[p]roof of discriminatory motive . . . is not required."  *Teamsters*, 431 U.S. at 335-36.  Rather, a plaintiff must identify (1) "a facially neutral employment policy or practice," (2) a "significant disparate impact" on members of a protected group, and (3) a "causal connection" between the policy and the disparate impact.  *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).  "Allegations which contend only that there is a bottom line racial imbalance in the work force are insufficient."  *Id.*  As under a disparate treatment theory, "a plaintiff need not plead a prima facie case" to survive a motion to dismiss—but "she must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020).  The Second Circuit has suggested that this burden is somewhat greater than the "minimal support" burden in disparate treatment claims.  *See id.* at 209 n.3.  And, as under a disparate treatment theory, "[a] plaintiff may rely solely on statistical evidence to establish a prima facie case of disparate impact," but that evidence "must reflect a disparity so great that it cannot be accounted for by chance."  *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1999).  In

other words, the evidence "must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Mandala*, 975 F.3d at 209.

### B.    Application

#### 1.   Discriminatory Promotion Claim

Plaintiffs' discriminatory promotion claim fails to plead sufficient facts from which the Court may infer either timeliness or a plausible claim.

As previously noted, Probation Officers seeking to become Supervising Probation Officers must take an exam and achieve one of the three highest scores to be eligible for promotion.  N.Y. Civ. Serv. L. §§ 52, 61.  But because Plaintiffs have not pleaded that any female Probation Officers of color who were allegedly denied promotional opportunities took the exam and received one of the three highest scores such that they were eligible for promotion, they have not raised a plausible inference of discrimination.  *Littlejohn*, 795 F.3d at 311 ("Absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, *was qualified*, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent.") (emphasis added).  Without alleging the necessary element of qualification, "it is equally possible that Plaintiffs have not been promoted for valid, non-discriminatory reasons." *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (rejecting, in the § 1983 context, a similarly skewed statistical showing at the motion to dismiss stage and observing that plaintiffs provided no "detail as to . . . the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level").  Plaintiffs' sparse pleading also fails to establish timeliness, as they have not alleged that any discrete act in furtherance of the alleged

pattern or practice—that is, any discrete denial of a promotional opportunity—occurred within the limitations period.

Moreover, "[w]ithout any allegations . . . regarding the relevant pool of qualified applicants, Plaintiffs' claims are insufficient to show the requisite causal link" between the City's policies or practices regarding promotions and any resulting disparate impact. *Syeed v. Bloomberg L.P.*, No. 20-cv-7464 (GHW), 2021 WL 4952486, at *22 (S.D.N.Y. Oct. 25, 2021) (rejecting, for similar reasons, a disparate impact claim alleging hiring and promotion discrimination that challenged the disproportionately low number of female reporters); *see also Brown*, 163 F.3d at 712 (2d Cir. 1998) (explaining that "[a]llegations which contend only that there is a bottom line racial imbalance in the work force are insufficient" to state a disparate impact claim). Nor do Plaintiffs allege that female Probation Officers of color took the examination but did not receive a qualifying score because the exam itself is discriminatory, or that they were deterred from taking the exam—either of which could potentially support their claim. *See, e.g.*, *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *United States v. Brennan*, 650 F.3d 65, 119, 126 & n.61 (2d Cir. 2011).

To be sure, Plaintiffs' expert's conclusion that "white males are almost twice as likely to become supervising probation officers than their counterparts of other races and/or gender[s]" is deeply troubling. Compl. Ex. C at 1; *id.* at 2 (documenting that 17% of women of color in the UPOA sample were Supervising Probation Officers while 73% of white men in that sample were Supervising Probation Officers).[6] If Plaintiffs had alleged that female Probation Officers of color

---

[6] It is worth noting that these statistics may be vulnerable to challenge. According to Plaintiffs' data, the 17% of women of color who are Supervising Probation Officers amounts to 188 individuals, while the 73% of white men who are Supervising Probation Officers amounts to just 11 individuals. This means that, notwithstanding the greater likelihood that white men will become Supervising Probation Officers, the majority of Supervising Probation Officers in the sample (specifically, 63%) are women of color. Given that this "preferred" comparator group is itself majority-minority, Plaintiffs may have trouble establishing the requisite disparate impact when comparing the demographic

who were not promoted were *eligible* for such promotions, these statistics might well provide the foundation for a viable claim.  But without any such allegations, the Court cannot rely on these statistics alone to infer either a pattern or practice of discrimination or that any disparate impact on women of color was *caused* by a particular policy or practice.  Accordingly, Plaintiffs' discriminatory promotion claim is dismissed.[7]

### 2.  Discriminatory Compensation Claim

As a threshold matter, the Court concludes that Plaintiffs' discriminatory compensation pattern-or-practice claim is timely.  Because the EEOC charge was filed on June 7, 2019, Plaintiffs must plead that discrete acts of discriminatory compensation occurred after August 11, 2018—300 days before the charge was filed.  Several Plaintiffs are current Probation Officers, and therefore have received paychecks since August 2018.  Each of those payments is a discrete act that falls within the limitations period.  *See Davis*, 794 F.3d at 269 ("[Title VII] makes it unlawful to apply a discriminatory compensation decision to an employee and starts a new statute of limitations clock with each paycheck that reflects that decision.").  Moreover, "identifiable discrete actions are not time-barred simply because they occurred as part of an ongoing pattern of discrimination . . . that began outside the statutory period." *Vega*, 801 F.3d at 79.  Indeed, so long as "one alleged adverse employment action . . . occurred within the applicable filing period . . . evidence of an earlier alleged retaliatory act may constitute relevant background evidence in support of [that] timely claim." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005).

---

composition of Probation Officers and Supervising Probation Officers.  Such challenges, however, are better suited for later stages of the litigation.

[7] Plaintiffs contended at oral argument that, because they are relying on the pattern-or-practice method of proof, they need only identify the discriminatory practices, and need not make allegations about any specific individuals.  Oral Arg. Tr. at 17:16-25.  They must still, however, plausibly allege the existence of a *discriminatory* policy, which they have failed to do given their failure to plead eligibility or other facts supporting the discriminatory nature of the promotional policy.

Nonetheless, Plaintiffs' discriminatory compensation claim falters on the merits, whether assessed under the disparate impact framework or the disparate treatment framework.[8]  At argument, Plaintiffs clarified that their discriminatory compensation claim rests on two separate allegations: (1) that all Probation Officers—that is, Probation Officer Trainees, Probation Officers, and Supervising Probation Officers—are paid less than other titles in the DOP that are more heavily represented by white men; and (2) that there is intra-title pay disparity based on race and gender within each rank of Probation Officers.  The Court considers each theory in turn.

First, Plaintiffs allege that the City "hir[es] Probation Officers, and specifically non-white and female Probation Officers at the lowest rate of salary and suppress[es] their salaries to the most minimum amount allowable over the duration of their employment" while paying "at higher rates upper-level employees and employees who are in titles in the DOP that are more white and male." Compl. ¶¶ 27-28.  This allegation can be plausibly read to state either a disparate treatment claim—that the City suppresses Probation Officers' salaries *because* that population is primarily composed of women of color—or a disparate impact claim—that the City has a neutral policy of suppressing salaries for all Probation Officers while paying higher salaries to those in other DOP titles, which adversely impacts a population that is disproportionately made up of women of color.

The only job title Plaintiffs identify that is "more white and male" is that of Administrative Staff Analyst.  Plaintiffs contend that Analysts are paid more, despite the fact that "the skill[,]

---

[8] The Court rejects the City's argument that no discriminatory pay claim can lie because DOP salaries were negotiated by the City and the UPOA via a collective bargaining agreement.  The agreement does set minimum and maximum salaries for Probation Officers and Supervising Probation Officers—but it appears to allow for discretionary variances in compensation within those set ranges, Compl. Ex. B at 5-6, which is consistent with Plaintiffs' claims that the DOP suppressed Probation Officers' salaries to the minimum allowable amounts and paid female employees of color less than white male employees in the exact same titles.  Compl. ¶¶ 28, 61; *see id*. ¶¶ 53, 55 (alleging that the City delegates authority in hiring and compensation decisions to DOP without the regulations in place "to ensure non-discriminatory employment practices").  More broadly, the fact that the UPOA had some influence in determining salaries and pay increases for Probation Officers does not mean that the City had no such influence.  In other words, if the City came to the bargaining table with lower proposed salaries as a result of discrimination, and if those lower proposed salaries affected the final agreed-upon salary ranges, the City would still have effectively suppressed wages.

knowledge and ability required for" this position is less than that required to be a Probation Officer, Compl. ¶ 56. The first deficiency with this allegation is that it fails to create a plausible inference that Administrative Staff Analysts and Probation Officers "perform equal work" such that this comparison can provide the basis for a discrimination claim. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019) ("[O]ne way an employer might discriminate against an employee because of her sex is to pay her less than her male peers who perform equal work.").[9] To perform equal work for purposes of a pay discrimination claim, individuals must perform "the same job" requiring the same "effort" and "responsibility" and "under similar working conditions." *Barrett*, 39 F. Supp. 3d at 434-35; *see Rose v. Goldman, Sachs & Co., Inc.*, 163 F. Supp. 2d 238, 242 (S.D.N.Y. 2001) (noting, in the Equal Pay Act context, that a plaintiff "must show that the two positions are substantially equal in skill, effort and responsibility").[10] Merely stating that the Administrative Staff Analyst job requires less "skill[,] knowledge and ability" articulates just part of this requirement: it does not provide a sufficient description of the responsibilities, requirements, or working conditions of Administrative Staff Analysts that would allow the Court to plausibly infer that they perform equal work to Probation Officers. *See Faughnan v. Nassau Health Care Corp.*, No. 19-cv-03171 (RJD) (RLM), 2021 WL 1566138, at *8 (E.D.N.Y. Mar. 18, 2021) (dismissing a claim in the analogous Equal Pay Act context when the "plaintiff merely allege[d] the titles and salaries of" comparators and alleged that "they, like all attorneys at the company, did the same work, without an explanation of what that work entails"); *cf. Chiaramonte v. Animal Med. Ctr.*,

---

[9] At oral argument, Plaintiffs asserted that Administrative Staff Analysts "do comparable work." Oral Arg. Tr. at 18:10. But Plaintiffs may not amend their pleading through statements made at argument. *See Red Fort Cap., Inc v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 476 (S.D.N.Y. 2019).

[10] Recognizing that "job content and not job title or description" is the ultimate "standard for determining whether there was a violation of the anti-discrimination laws," *Chepak v. Metro. Hosp.*, 555 Fed. App'x 74, 77 (2d Cir. 2014), "Administrative Staff Analyst" appears to describe a very different position from that of a Probation Officer.

No. 13-cv-5117 (KPF), 2014 WL 3611098, at *5 (S.D.N.Y. July 22, 2014) (finding that a plaintiff stated a claim when she "alleged that she and [a comparator] both performed similar work as veterinarians practicing internal medicine; that, in addition to those duties, she shouldered responsibilities that [the comparator] did not match; and that, if anything, she worked under more demanding conditions than [the comparator], including working more days each week").[11]

The second deficiency is that Plaintiffs provide no facts supporting their assertion that Administrative Staff Analysts are indeed paid more than Probation Officers—whether anecdotal, statistical, or otherwise.  The resulting conclusory nature of this allegation bars both a disparate treatment claim and a disparate impact claim based on a comparison to Administrative Staff Analysts.  *See Pyskaty*, 856 F.3d at 225 (a court need not accept conclusory factual allegations on a motion to dismiss); *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) ("The naked allegation that appellees 'selectively enforc[ed] the College rules . . . against plaintiffs . . . because they are black [or] Latin' is too conclusory to survive a motion to dismiss.").  Indeed, this Court has previously explained that even if plaintiffs in a pattern-or-practice claim "cannot allege the precise amount of [their] coworker[s'] salary, [they] should at least be able to allege the facts that form the basis for [their] belief that [the coworkers are] paid more."  *Barrett*, 39 F. Supp. 3d at 432.  Plaintiffs have failed to do so. Without that, the Court can infer neither disparate treatment nor a neutral policy that creates a disparate impact.

Of course, this is not to say that a plaintiff must always allege unequal pay for equal work in order to state a Title VII disparate treatment claim; that is merely one available method of proof.

---

[11] Nor do Plaintiffs allege that Administrative Staff Analysts' salaries are also set at a specified range but that they are paid more than the lowest allowable amount within that range, in contrast to Probation Officers.  *Cf. Lenzi*, 944 F.3d at 111 (approving a plaintiff's allegation that she was paid at a rate below the prevailing market rate for her position while men in different positions were paid at an above-market rate).

*See Lenzi*, 944 F.3d at 110; *Barrett*, 39 F. Supp. 3d at 434 n.9 (explaining that a Title VII plaintiff may succeed on her claim "simply by showing that an employer intentionally depressed the wages of female employees, even if the employer did not employ any male employees").  But here, Plaintiffs expressly base their pay discrimination claim on a comparison between Probation Officers and other, more white and male DOP titles; therefore, they must plausibly allege that those white males are doing equal work but are paid more for that work.  *See Hernandez v. Premium Merch. Funding One, LLC*, No. 19-cv-1727 (WHP), 2020 WL 3962108, at *9 (S.D.N.Y. July 13, 2020) ("Although Hernandez is not required to allege that she performed equal work for unequal pay, her failure to plead any additional facts to show that she was similarly situated to any of her male colleagues at PMF is insufficient to create an inference of discrimination.").  Accordingly, the Court finds that Plaintiffs have failed to allege a plausible Title VII discriminatory compensation claim based on pay disparities between all Probation Officers and other titles within the DOP.

Second, Plaintiffs allege that "Probation Officers who are female and non-white are paid less than their white and male counterparts in the same titles, despite the fact that they are performing the same or substantially the same work."  Compl. ¶ 61.  Although this allegation lends itself more neatly to a disparate treatment theory, it could support a disparate impact theory if these pay disparities result from the exercise of discretion—as Plaintiffs suggest when they assert that the City has delegated compensation decisions to DOP without the necessary oversight "to ensure non-discriminatory" practices.  Compl. ¶¶ 53, 55; *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) ("[W]e have recognized that, in appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory.")

The problem, however, is that the bare allegation that women of color are "paid less" than their white male counterparts in the same titles is a conclusory assertion that the Court need not accept as true. *See Pyskaty*, 856 F.3d at 225.  Again, even if pattern-or-practice plaintiffs "cannot allege the precise amount of [their] coworker[s'] salary, [they] should at least be able to allege the facts that form the basis for [their] belief that [the coworkers are] paid more." *Barrett*, 39 F. Supp. 3d at 432.  Facts forming the basis for that belief may include "allegations of a sufficient number of instances of discrimination" such that there is "a plausible inference that discrimination was the defendant's standard operating procedure." *Id.* at 430.  For instance, this Court has found that allegations made on information and belief were sufficient to state a pattern-or-practice pay discrimination claim when "each of the ten Plaintiffs (1) state[d] the amount of her base salary, (2) identifie[d] at least one male comparator, and (3) allege[d] that the comparator received a higher base salary." *Id.* at 432.  Plaintiffs have failed to assert such facts or to otherwise provide factual allegations that render their assertion of intra-title pay discrimination plausible.[12]

Nor do the statistics that Plaintiffs provide support the inference that women of color are paid less than white men in the same titles.  Plaintiffs rely on the New York City Public Advocate's findings that new DOP male hires are paid an average of $2,583 more than new DOP female hires and that men in the DOP receive an average pay increase of $971 more than women in the DOP. *Id.* at 32, 34.  But the report appears to group all jobs within the DOP together—it does not break salary disparities down by title.  Similarly, Plaintiffs' expert economist concluded that the pay disparities he identified were "largely attributable to race and gender disparities in job title"— indeed, that "[j]ob title disparity by race and gender *results in* a salary disparity by race and

---

[12] The Court shares the City's position, articulated at oral argument, that Plaintiffs' statistical analysis suggests that they have in their possession specific salary information for their white male colleagues that could bolster their allegations.  Oral Arg. Tr. at 5:23-6:1.

gender." Compl. Ex. C at 1 (emphasis added). In short, neither of these sources provide factual content that supports Plaintiffs' bare assertion of intra-title pay disparities.

Accordingly, the Court finds that Plaintiffs have failed to state a plausible Title VII claim, whether based on discriminatory compensation or discriminatory promotion.[13]

## II.    NYSHRL and NYCHRL Claims

"Claims brought under the NYSHRL are analytically identical to those brought under Title VII." *Hagan v. City of New York*, 39 F. Supp. 3d 481, 503 (S.D.N.Y. 2014); *accord Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011), *and Gordon v. City of New York*, No. 14-cv-6115 (JPO) (JCF), 2016 WL 4618969, at *7 (S.D.N.Y. Sept. 2, 2016). Plaintiffs' NYSHRL claims are therefore dismissed.

"[A]lthough the analysis under the [NY]CHRL differs in certain respects . . . in each instance the city law grants employees broader protections than its federal and state counterparts." *Hagan*, 39 F. Supp. 3d at 503; *accord Gordon*, 2016 WL 4618969, at *7 (noting that the NYCHRL has a "more lenient standard"). The Court dismissed Plaintiffs' Title VII pay discrimination claims due to the conclusory nature of Plaintiffs' allegations; this reasoning rests on pleading standards that are equally applicable to claims brought under the NYCHRL, regardless of that law's more lenient legal standard. Similarly, Plaintiffs' Title VII promotion discrimination claims fail to adequately allege that disparities in title were *caused by* Defendant's conduct, policies, or practices—and the NYCHRL still requires allegations of causation. *See, e.g., Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (concluding that to show disparate treatment under the NYCHRL, "a plaintiff "need only show differential treatment—that

---

[13] Plaintiffs also argue that "Defendant has segregated non-white and female employees into one agency, the DOP, [which] has alone been held by many courts to be sufficient to infer an employer's discriminatory intent." Opp. MOL at 21-22. But Plaintiffs have alleged no facts suggesting that the City funneled women of color into the DOP or prevented such employees from transferring out of the DOP and into other departments.

she is treated less well—because of a discriminatory intent"); *Richardson v. City of New York*, No. 17-cv-9447 (JPO), 2018 WL 4682224, at *9 (S.D.N.Y. Sept. 28, 2018) ("To state a disparate-impact claim under NYCHRL, Plaintiffs must plausibly (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two."). Accordingly, Plaintiffs' NYCHRL claims are dismissed. *See, e.g.*, *id.* (dismissing a NYCHRL claim when the plaintiff failed "to raise a plausible inference that FDNY's African American civilian employees are systemically treated less well in terms of compensation than are their peers of other races").

### III.   Equal Protection Claim

For Plaintiffs to plead the City's § 1983 liability under *Monell v. Department of Social Services*, 426 US. 658 (1978), they must plausibly allege that the deprivation of their Equal Protection rights was "caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "The alleged policy does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so persistent and widespread . . . as to constitute a custom or usage with the force of law." *Velez*, 325 F. Supp. 2d at 312-13; *cf. Missel v. County of Monroe*, 351 Fed. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."); *accord Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (stating that a policy or custom can be established by "discriminatory practices of city officials [that] are persistent and widespread" or "actions of subordinate city employees . . . [that] are so manifest as to imply the constructive

acquiescence of senior policy-making officials"). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an affirmative link, between the policy and the deprivation of his constitutional rights." *Deferio v. City of Syracuse*, 770 Fed. App'x 587, 590 (2d Cir. 2019). "[S]tatistics alone may be sufficient" to state a § 1983 claim, but those statistics "must . . . be of a level that makes other plausible non-discriminatory explanations very unlikely." *Id.* at 69.

"Once the color of law requirement is met, a plaintiff's equal protection claim parallels his Title VII claim . . . [t]hus, for a § 1983 discrimination claim to survive a motion for judgment on the pleadings or a motion to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim." *Vega*, 801 F.3d at 88; *see Collymore v. City of New York*, 767 Fed. App'x 42, 47 (2d Cir. 2019) (dismissing *Monell* claim after dismissing Title VII disparate treatment claim). Accordingly, for the same reasons that the Court dismissed Plaintiffs' Title VII claims, it dismisses their § 1983 claims.

## IV.    Leave to Amend

"Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-cv-7840 (RA), 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021). The Court grants leave to amend here because Plaintiffs may be able to plead additional facts that would cure the deficiencies the Court has identified, both as to timeliness and as to the merits. Accordingly, the Court's dismissal is without prejudice.

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss is granted. The Clerk of Court is respectfully directed to terminate the motions at docket numbers 12 and 17. If Plaintiffs intend to

file a Second Amended Complaint, they shall do so by no later than April 14, 2022.  Failure to file

a Second Amended Complaint by that date will result in dismissal of this case with prejudice.

SO ORDERED.

Dated: March 24, 2022
New York, New York

                                                                    _____
                                                                   Hon. Ronnie Abrams
                                                                     United States District Judge